IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:20CR300 |
| vs. | |
| NOLAN BALY, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress Evidence. (Filing No. 41.) An evidentiary hearing was held regarding the motion on August 10, 2022. A transcript has been filed. Post hearing briefs have been filed and this matter is ripe for disposition. For the reasons explained below, the undersigned will recommend that the motion be denied.

**FACTS**

Nebraska State Patrol Trooper Troy Goodschmidt ("Trooper Goodschmidt") testified at the evidentiary hearing in this case. Trooper Goodschmidt has been with the Nebraska State Patrol since 2007. (TR. 10.) Trooper Goodschmidt works in the patrol division, primarily working traffic on I-80 in Dawson County, Nebraska. (TR. 10.) Trooper Goodschmidt testified he has approximately twelve years' experience dealing with commercial motor vehicles. (TR. 12.) Trooper Goodschmidt testified that as a Nebraska State Patrol trooper, he has dealt with truckloads and is required to do thirty-five driver inspection reports a year. (TR. 11-12.)

On August 15, 2020, Trooper Goodschmidt was traveling westbound on I-80. (TR. 10). He observed Randy's and Brian's Towing assisting a white commercial box truck on the eastbound side of the road. (TR. 10-11; Ex. 101.) The box truck had black smoke coming out of its exhaust

and the tow truck was parked in front of the box truck. (Ex. 101; Ex. 1.) Trooper Goodschmidt testified that he turned around in the median and came back to run traffic control at the site where the tow truck and box truck were stopped to make sure traffic was moving over. (TR. 11.) Trooper Goodschmidt testified he did not observe any criminal activity at that time. (TR. 26.) Trooper Goodschmidt stated that as he was traveling westbound, he could only see the DOT number on the truck, and he could not see if there was any writing on the truck. (TR. 36-37.) Trooper Goodschmidt estimated he was traveling approximately sixty to sixty-five miles per hour. (TR. 36.)

When Trooper Goodschmidt pulled up behind the box truck, Brian Thornburg ("Thornburg"), the tow truck driver from Randy's and Brian's Towing, met him at the back of the box truck and asked him to stay while he finished hooking the truck up to be towed. (TR. 11; TR. 26-27.) Trooper Goodschmidt was wearing a body camera at the time which recorded the encounter. (Ex. 1.) Trooper Goodschmidt testified he noticed there was both a load seal and padlock on the backdoor of the truck. (TR. 11.) Trooper Goodschmidt stated he also observed that a company name was handwritten on the truck above the DOT number in what appeared to be black Sharpie or black magic marker. (TR. 12-13; Ex. 1; Ex. 101.) Trooper Goodschmidt testified the writing was faded like the marker that had written it had run out of ink at certain points. (TR. 13.) The writing on the truck said: "Leased to Denduta Express." (Ex. 1; Ex. 101.)

Trooper Goodschmidt performed a DOT check on the truck by running the DOT number through a database. (Ex. 1.) After running the DOT check, Trooper Goodschmidt went to the front of the truck to look for the driver, who was later identified as Defendant. (TR. 14; Ex. 1.) Trooper Goodschmidt located Defendant behind his patrol car positioning emergency triangles. (TR. 14-15; Ex. 1.) Trooper Goodschmidt went back towards the patrol car and told Defendant to pick up the triangles. (TR. 15; Ex. 1.) Defendant complied with this request. (TR. 15; Ex. 1.) Trooper Goodschmidt testified he instructed Defendant to pick up the triangles because he planned to stay until the truck was removed from the shoulder, so the triangles were not needed because he had his emergency lights on. (TR. 15; Ex. 101.)

Once the triangles were picked up, Defendant came back to where Trooper Goodschmidt and Thornburg were standing. (TR. 15; Ex. 1.) Trooper Goodschmidt asked Defendant if he had his paperwork and CDL. (TR. 15; Ex. 1.) Defendant responded he did. (Ex. 1.) Defendant

provided Trooper Goodschmidt the bill of lading and his CDL.  (TR. 15-16; Ex. 1.)   Defendant did not have a registration for the truck and told Trooper Goodschmidt that a different driver took the registration by mistake.  (TR. 16; Ex. 1.)

Trooper Goodschmidt took Defendant's CDL and the bill of lading back to his patrol car. (Ex. 1.) Trooper Goodschmidt testified that he reviewed the bill of lading, which he said indicated where Defendant was coming from, where he was going, and what he was hauling.  (TR. 16.) Trooper Goodschmidt testified the load was picked up in California and was going to Pennsylvania, and that the load included electronics.  (TR. 17.) Trooper Goodschmidt stated that the trailer plate listed on the bill of lading did not match the plate on the truck.  (TR. 16; Ex. 101.) Trooper Goodschmidt noted that there was no load seal number on the bill of lading.  (TR. 16.) Trooper Goodschmidt testified this was significant because normally shippers include a load seal number to indicate that the load was sealed in case anything turns out to be missing.  (TR. 16.) Trooper Goodschmidt also testified that the load was insured for approximately $100,000, which is a high dollar load and, in his experience, usually have self-locking seals.  (TR. 17-18.) While in his patrol car, Trooper Goodschmidt called dispatch and checked Defendant's license and got his criminal history.  (TR. 16.) Trooper Goodschmidt testified that Defendant's criminal history showed that Defendant had numerous criminal charges.  (TR. 16.)

Trooper Goodschmidt exited his patrol car and returned to the rear of the truck.  (Ex. 1.) Trooper Goodschmidt asked Defendant about the load seal and the information on the bill of lading. (TR. 18.)  Defendant told Trooper Goodschmidt that he put the seal on the truck.  (TR. 18; Ex. 1.)  Trooper Goodschmidt also asked Defendant why the trailer plate did not match what was on the bill of lading.  (Ex. 1.)  Defendant said he did not know.  (Ex. 1; Ex. 101.)

Trooper Goodschmidt then had a conversation with Thornburg and asked him how long everything was going to take.  (TR. 19; Ex. 1.)  Thornburg told him the process of getting the truck ready to be towed would take at least ten minutes.  (TR. 19; Ex. 1.)  Trooper Goodschmidt told Thornburg he was going to search the truck.  (TR. 19; Ex. 1.) Trooper Goodschmidt testified he wanted to know how much time Thornburg was going to be working because he did not want to hinder Thornburg's ability to leave.  (TR. 19.) Trooper Goodschmidt testified that at that point, he knew he had reasonable suspicion that there was something illegal in the truck and that if Defendant would not consent to a search, he was going to call a K-9 and detain Defendant.  (TR.

3

19; TR. 40.) Trooper Goodschmidt testified he had reasonable suspicion based on the lock on the door of the truck, the writing on the side of the truck, the way Defendant attempted to distance himself from the truck, the trailer plate being wrong, and Defendant's criminal history. (TR. 19-20.) In addition to these things, the incident report indicated Trooper Goodschmidt based reasonable suspicion on the lack of load seal and Defendant's placement of the seal on the truck. (Ex. 101.)

After speaking to Thornburg, Trooper Goodschmidt returned to Defendant and asked him if he had the key to the lock on the back of the truck. (Ex. 1.) Defendant said he did. (Ex. 1.) Trooper Goodschmidt then asked Defendant for consent to search, and Defendant responded: "If you want, if you'd like" and appeared to shrug his shoulders. (TR. 20; Ex. 1.) Trooper Goodschmidt responded "Yeah" and then asked Defendant to open the truck and break the load seal. (TR. 20; Ex. 1.) Defendant retrieved the keys, walked to the back of the truck, unlocked the truck, and opened the backdoor. (TR. 20-21; Ex. 1.) Defendant did not tell Trooper Goodschmidt he could not search or indicate he did not want to open the truck. (TR. 21; Ex. 1.)

Once the truck was open, Trooper Goodschmidt crawled into the back. (TR. 21; Ex. 1.) Trooper Goodschmidt said he could smell the odor of marijuana when the door was opened. (TR. 21; Ex. 1.) Trooper Goodschmidt stated he went further into the truck and observed pallets with security seal resembling police tape around them. (TR. 21; Ex. 1.) Most of the boxes had up arrows on them and writing that said do not stack flat and fragile. (TR. 21.) There were also loose boxes laying in different directions. (TR. 21.) Trooper Goodschmidt stated those boxes looked like they had just been thrown in the truck. (TR. 48.) Trooper Goodschmidt testified that he bent down to one of the boxes and smelled the scent of marijuana coming from the box. (TR. 21.) Trooper Goodschmidt then exited the truck and asked Thornburg to smell the load and see if he noticed anything. (Ex. 1.) Thornburg walked to the back of the truck and stated he smelled marijuana. (Ex. 1.) Trooper Goodschmidt testified that at that point, he had probable cause to search the truck, so he did not call for a K-9. (TR. 41.) Trooper Goodschmidt informed Thornburg that the truck needed to be towed so it could be searched. (TR. 22; Ex. 1.) Trooper Goodschmidt testified the truck had to be towed before it was searched because it was a cargo truck full of boxes and they had to off-load the truck. (TR. 44.)

4

Defendant walked to the back of the truck and Trooper Goodschmidt asked him why it smelled like marijuana in the truck. (Ex. 1; Ex. 101.) Defendant responded that he did not know and that he does not smoke marijuana. (Ex. 1; Ex. 101.) Trooper Goodschmidt asked Defendant if there was any marijuana in the truck and Defendant said he did not load the truck. (Ex. 1; Ex. 101.) Trooper Goodschmidt asked Defendant if there was any marijuana in the cab of the truck and Defendant told him no, and also told him he could search the cab. (Ex. 1.) Trooper Goodschmidt testified Defendant was not placed in custody at that time but was detained. (TR. 23.) Defendant rode with Thornburg in the tow truck to the Lexington Department of Road's lot where the truck was to be searched. (TR. 23.) At the Department of Road's lot, a K-9 was run around the truck, and it alerted to the odor of narcotics. (TR. 23.) Trooper Goodschmidt testified he had a K-9 sniff the truck for liability reasons in case anything got broke. (TR. 42.) The truck was searched, and 2,000 pounds of marijuana was located. (TR. 24.) Trooper Goodschmidt testified Defendant was then placed in custody. (TR. 24; TR. 45.)

Trooper Goodschmidt was dressed in uniform during his encounter with Defendant. (TR. 40.) Trooper Goodschmidt stated Defendant did not appear to be under the influence of drugs or alcohol. (TR. 24; Ex. 1.) Trooper Goodschmidt testified Defendant appeared to understand questions and responded appropriately. (TR. 24; Ex. 1.) Trooper Goodschmidt stated he did not threaten, coerce, or bargain with Defendant and that the encounter was very cordial. (TR. 24; TR. 48; Ex. 1.)

## DISCUSSION

Not all contacts between law enforcement and citizens constitute seizures which implicate the Fourth Amendment. *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998). "A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area—even if the officer has no reason to suspect the individual is involved in criminal activity—provided the officer does not indicate that compliance with his request is required." *Id*. (quotation omitted).

Law enforcement may engage in a community-caretaking function with respect to motor vehicles. An officer's exercise of that function by approaching a disabled vehicle does not necessarily amount to a seizure requiring probable cause or reasonable suspicion. *United States*

5

*v. Salgado*, 761 F.3d 861, 865 (8th Cir. 2014) (finding no seizure where an officer approached a disabled vehicle and a reasonable person in the defendant's position would have understood that the officer had legitimate reasons to monitor the situation).

Defendant contends his encounter with Trooper Goodschmidt was not consensual. This argument is wholly unsupported by the record. The evidence shows that Trooper Goodschmidt observed Defendant's broken-down truck and stopped to control traffic, which is perfectly reasonable and what most individuals would likely expect in such a situation. As he pulled up to the scene, Thornburg asked Trooper Goodschmidt to stay until the truck was ready to be towed. There is no indication that Trooper Goodschmidt came to, or remained at, the scene for any improper purpose. While waiting for the truck to be ready to be towed, Trooper Goodschmidt asked Defendant to see his CDL and registration. Defendant provided the paperwork in his possession without hesitation. There is no evidence that Trooper Goodschmidt somehow indicated Defendant had no choice but to provide Trooper Goodschmidt the paperwork or comply with any requests.

Defendant also argues his rights were violated because he did not consent to the search of the truck. An individual's voluntary consent to a search is an exception to the Fourth Amendment's warrant requirement. *United States v. Esquivel*, 507 F.3d 1154, 1160 (8th Cir. 2007). *See also States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990) ("Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area."). Courts determine whether consent is voluntary under the totality of the circumstances. *Esquivel*, 507 F.3d at 1160. "The [g]overnment bears the burden of proving voluntary consent by a preponderance of the evidence and must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual." *Id*.

When considering whether consent was given freely and voluntarily, courts consider (1) age, (2) general intelligence and education, (3) whether the individual was under the influence of drugs or alcohol, (4) whether the individual was informed of the *Miranda* rights, and (5) whether the individual had experienced prior arrests and was thus aware of the protections the legal system affords suspected criminals. *Chaidez*, 906 F.2d at 381. Other factors considered include: the

6

length of time the individual was detained; whether the police threatened, physically intimidated, or punished the suspect; whether the police made promises or misrepresentations; whether the suspect was in custody or under arrest when the consent was given; whether the consent occurred in a public or a secluded place; and whether the suspect stood by silently as the search occurred. *Id*. "These factors should not be applied mechanically, because the concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules." *Id*. (internal quotation omitted).

The totality of the circumstances shows Defendant provided clear that unequivocal consent to search. This conclusion is apparent based on Defendant's words and actions. The video of the encounter shows that in response to Trooper Goodschmidt's request to search, Defendant responded: "If you want, if you'd like" and shrugged his shoulders. Defendant then retrieved the keys, walked to the back of the truck, unlocked the truck, and personally opened the backdoor. Defendant did not revoke consent to search at any time and stood-by during the search without objection. In fact, after Trooper Goodschmidt exited the back of the truck and asked whether there was marijuana in the cab, Defendant gave Trooper Goodschmidt permission to search the cab without even being asked for this permission.

The evidence shows consent was provided freely and voluntarily. Defendant did not appear to be under the influence of drugs or alcohol and responded appropriated to questions. Given his prior criminal record, Defendant was experienced with law enforcement and the protections provided by the criminal justice system. Defendant provided consent in a public place and the tow truck driver was also present. The video of the encounter shows that Trooper Goodschmidt did not threaten, coerce, or bargain with Defendant in any way. The entire encounter was very cordial. Defendant was even permitted to ride with the tow truck driver to the lot where the truck was searched, and he was not placed in handcuffs.[1]

---

[1] Defendant complains Trooper Goodschmidt made the decision to search the truck before he obtained consent. This is of no consequence. Defendant was not told he was detained before he provided consent to search. Further, by that point, Trooper Goodschmidt had sufficient reasonable suspicion to detain Defendant for further investigation, based on the totality of the circumstances. Trooper Goodschmidt testified he planned to call for a K-9 in the event consent was denied.

Once Trooper Goodschmidt opened the door to the truck and stepped inside, he smelled marijuana. This provided Trooper Goodschmidt probable cause to search the entire truck. *United States v. Smith*, 990 F.3d 607, 612 (8th Cir. 2021) ("[B]ased on the smell of marijuana emanating from the car and the marijuana cigarette found in the passenger's jacket, the officers also had probable cause to search the entire vehicle for drugs and drug paraphernalia"). Defendant was then detained, and the truck was towed to a lot where it could safely be searched. Therefore, the evidence located during the search should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress Evidence (Filing No. 41) be denied.

Dated this 10th day of November, 2022.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.